E. W. STEPHENS et al., Constituting State Capital Commission Board, v. JOHN P. GORDON, State Auditor.

**In Banc, December 8, 1915.**

1. **NEW STATE CAPITOL: Furniture.** The Act of March 24, 1911, Laws 1911, p. 108, providing for the building of a new state capitol, invested the State Capitol Commission Board with no authority to purchase furniture for the new building. The board is by it created "for the purpose of building a new state capitol," and it specifically says that the terms of its members "shall end with the construction of the building;" and while it makes an appropriation of the money for the construction of building and the purchase of additional grounds, it makes none for buying furniture.

2. ————: ————: **Purchaseable Out of Other Funds.** The said act limits the State Capitol Commission Board's power to expend money to a sum of $500,000 less than the bond issue authorized by the people; and the cognate acts disclose that this $500,000 is the sum set aside by the act submitted to the people as the maximum amount, out of the proceeds of the bonds, which is to be available for other purposes than the construction of the capitol, including furniture, and this entire sum, out of which the provision for furniture is made, the board is directly excluded from using.

3. **AMBIGUITY IN STATUTE: Resort to its Title.** Where the terms of an act are ambiguous, resort may be made to its title for whatever light it can give; but resort to the title is not justified if the body of the act is free from ambiguity. And the Act of March 24, 1911, being entirely clear and on its face showing that it does not authorize the State Capitol Commission Board to purchase furniture for the new capitol, it is of no consequence that its title covers the furniture as well as its construction.

4. **NEW STATE CAPITOL: Building and Furniture: Single Board.** The act adopted by the people, authorizing the issuance and sale of bonds for building a new state capitol, did not provide that a single board should have charge of the construction of the capitol and the purchase of furniture, nor did it prohibit the creation of separate boards, nor provide for any board at all; but it left the Legislature untrammeled in that respect, and the cognate legislative act invests the only board it created with no power to buy furniture for the new building.

Stephens v. Gordon.

5. ———: **Construing Statute: Convenience.** Likelihood of delay in case furniture for the new capitol cannot be purchased before the meeting of the next Legislature unless it is held that the present State Capitol Commission Board is invested with power to purchase furniture, is an argument from convenience, which has a place in construing ambiguous statutes, but none in construing a clear and unambiguous one. Courts have no power to reconstruct statutes merely for the purpose of making them conform to their ideas of wisdom.

## Mandamus.

WRIT DENIED.

*A. T. Dumm* for relators.

(1) If there is any doubt as to the meaning of the statutes or ambiguities in their provisions, the court will construe the various provisions so as to avoid public inconvenience. (2) The court should look at the history of the times and all the surrounding circumstances in order to ascertain the scope and the purpose of the act creating the State Capitol Commission Board. (3) Reference to the title of an act is proper in cases of doubt, in order to ascertain the meaning of the act and to give it a reasonable interpretation. (4) There can hardly be a doubt that the various acts are *in pari materia*. The law found in Laws 1911, on page 416, is incorporated by reference and made a part of the acts of the same Laws on pages 108 and 250.

*John T. Barker,* Attorney-General, *Thomas J. Higgs,* Assistant Attorney-General, and *Lewis Hord Cook* for respondent.

(1) The act creating the "State Capitol Commission Board" does not authorize the purchase of office furniture or office equipment by said board. (2) The act is not ambiguous and therefore the title to said act should not be considered in construing the same.

If the title of the act is considered in the construction of said act then there is no authority given the "State Capitol Commission Board" by said act to purchase furniture for the offices in the capitol building. (3) The doctrines of public convenience and *in pari materia* are not used in the construction of an act when said act is not ambiguous. The act in this case is not ambiguous and these rules of construction are not applicable to this cause.

BLAIR, J.—This is a proceeding by mandamus, instituted by the members of the "State Capitol Commission Board" for the purpose of compelling the State Auditor to audit an account for office furniture for the new capitol and issue his warrant for $32.50 in payment thereof. This is the only purchase of the kind, so far as the petition shows. Respondent entered his appearance, waived the issuance of the alternative writ and demurred, generally, to the petition therefor. Relators thereupon moved for judgment.

Under the issues made, the sole question presented is whether the State Capitol Commission Board is empowered to purchase the furniture for the new capitol.

The title of the Act is as follows:

"An Act providing for building a new state capitol at the present seat of government of the State of Missouri and for acquiring other premises than those now owned by the State, for additional State capitol premises and making provision, and also appropriations out of the state treasury, for carrying out the purposes and provisions of this act, and also of an act of the General Assembly of this State entitled, 'An Act authorizing and directing the contracting of the liability of the State of Missouri by the issuance of its state bonds in a sum, not to exceed three and one-half millions of dollars, and for the sale of said bonds, to

provide means for the building, furnishing and other equipment of a new state capitol at the present seat of government of the State, and for the purchase of additional state capitol premises, and also providing for the payment of. said. bonds and interest accruing thereon,' Approved March 16, 1911." [Laws 1911, p. 108.]

Section 1 of the act first provides "that for the purpose of building a new state capitol at the present seat of government of this State, there is hereby created a board of commissioners to be styled the 'State Capitol Commission Board.' " The section then proceeds to fix the number and qualifications of the members of the board and provide the manner of their election, and continues: "Said commissioners . . . shall hold their offices until the completion of said building unless sooner removed for cause;" provides for bonds to be given by the members, for the filling of vacancies, for the general manner of conducting the business of the board, for its offices and times of meeting and for the compensation of members, and concludes: "The term of the members of the board shall end with the construction of the building proper."

Section 2 provides that "it shall be unlawful for any member of the board to be connected directly or indirectly in any manner with any contract or part thereof for the building of said state capitol or for any work or employment connected therewith or for the purchase or furnishing of any material or supplies therefor, or to accept any benefit therefrom, or the promise of any such benefit" in any manner, and then fixes drastic penalties for the violation of that provision and forbids the employment of any person as superintendent "of the construction of said building who is or shall become connected directly or indirectly with any contract for the building of said capi-

266Mo.14

tol or for the furnishing of any of the material or labor therefor.'' In this section is set out the oath to be taken by members of the board, as follows:

''I, ————————, do solemnly swear that I am not now and shall not, directly or indirectly, become interested or concerned in any manner with any contractor or contractors, person or persons, company or corporation for the construction of the state capitol or any part or portion thereof or in the proceeds or profits arising out of the same or in any work or labor done thereon or material furnished in the construction of said building, and that I shall faithfully and impartially, according to law, perform all my duties as a member of the State Capitol Commission Board.''

Section 3 provides for the purchase or condemnation of certain premises in Jefferson City, adjacent to the old capitol grounds.

Section 4 provides for the selection of ''plan for a state capitol; . said plan to be obtained by a competitive architectural contest,'' and defines in part the method to be pursued in that connection. It proceeds thus: ''No plan shall be adopted unless accompanied by a detailed and accurate specification of the approximate cost of material and other expenses necessary for the construction of said building, including heating and ventilating apparatus, lighting, vaults and all proper fixtures and conveniences, nor until it shall be definitely ascertained that the aforesaid cost shall not in the aggregate exceed three millions of dollars (and the interest received by the State on proceeds of sale of the bonds herinafter referred to). Said state capitol shall be so constructed and arranged as to afford suitable and adequate offices, compartments and conveniences for the departments of the state government at the seat of government. It shall be a modern, fireproof structure and be constructed of granite, or stone or both and other material suitable and proper to be used in said construction; shall have, above the base-

ment, a first floor for state office departments, also a second floor for legislative chambers and offices, and a third floor for offices and committee rooms; shall have a roof of either tiling, slate, sheet metal or other suitable material, and shall be provided with proper heating, lighting and ventilation facilities and with the most modern and approved sanitary arrangements and equipment."

The section then authorizes the board to confer with persons "conversant with the subject" and to visit other state capitols in order to procure information upon which to base its selection of a plan.

Section 5 authorizes the board, after adopting a plan, to enter into "a contract or contracts in writing for the construction of said capitol pursuant thereto." It authorizes the board to "contract for the construction of the entire building by a contractor, individual or corporate, who may undertake the whole work" or to make separate contracts for different classes of work, if the board deems it advisable to divide the work into classes. It requires all contracts for the construction of said building or for designated classes of the work thereof to be let to the lowest and best bidder, and provides the manner of letting bids, and requires that "all contracts for the construction of said building or classes of work thereof or for material and labor shall be in writing" and signed in a prescribed manner. It then proceeds: "No contract or contracts shall be made or entered into by the board incurring in the aggregate an expense greater than three millions of dollars and the interest received by the State on the proceeds of the sale of bonds hereinafter referred to for the construction of said building."

Provision is then made for the cancellation of contracts in proper cases, for the retention of a per cent from payments due on monthly estimates, and for the quality of materials used, for preference of Missouri

materials and labor, the use of Missouri granite and stone, and that the plans and specifications shall be executed by skillful and reputable architects, contractors, artists, mechanics and laborers. Bonds are required of contractors, and the preservation and filing of vouchers, contracts, files and papers is enjoined upon the board "until after the completion of said building, and shall then be delivered to the State Auditor for preservation by him in his office. The board is authorized to make all contracts and agreements and employ all the aid and assistance and adopt all means appropriate for carrying out the purposes of this act."

Section 6 prescribes the manner of appointment, qualifications, term of office, oath, bond and duties of the secretary of the board. Only one sentence of the section has any bearing upon the question in this case. It is as follows: "He shall keep a set of books showing in systematic form all the expenditures incurred by the board in and about the building and construction of said state capitol; also showing at all times the condition of the funds appropriated for and applicable for said purpose."

Section 7 provides for the appointment and prescribes the qualifications and duties of a superintendent of construction.

Section 8 provides that the Board of the Permanent Seat of Government shall decide tie votes in the State Capitol Commission Board and makes the Attorney-General its legal adviser.

Section 9 prescribes the manner in which accounts are to be audited and paid. There is nothing in the section throwing light upon the question in this case.

Section 10 reads as follows:

"Appropriation.—That if the act of the Forty-sixth General Assembly, to be submitted to the voters of this State, referred to in the next succeeding section of this act, shall be ratified by two-thirds of the legally

qualified voters of this State, voting at an election held for that purpose, and it thereby becomes a valid and binding law, and the bonds authorized by said act are issued and sold pursuant thereto, the entire proceeds of the sale thereof shall be paid into the state capitol building fund, then said proceeds (which it is estimated will aggregate the sum of three and one-half millions of dollars, more or less) shall be and the same · with all interest accruing therefrom, are hereby appropriated to the construction of the state capitol referred to in this act, to the purchase of additional State capitol premises as contemplated by this act, and to otherwise carrying out its purposes and provisions, and also the purposes and provisions of the act of the 46th General Assembly of this State to be ratified by the voters of the State and referred to in the next succeeding section of this act: *Provided,* however, that so much of the proceeds of the sale of said bonds as may be necessary for the purpose, may be used for the payment of the coupons of said bonds, maturing during the years 1911 and 1912; the same to be restored to said capitol building fund out of the moneys collected to pay said bonds and interest thereon, when so collected, and paid into the State treasury."

Section 11 reads as follows:

"Act, when effective.—That this act shall take effect and be in force from and after the ratification, by the voters of this State and the proclamation of the governor to that effect, of an act of the 46th General Assembly of this State entitled 'An act authorizing and directing the contracting of the liability of the State of Missouri by the issuance of its state bonds in a sum, not to exceed three and one-half millions of dollars, and for the sale of said bonds, to provide means for the building, furnishing and other equipment of a new state capitol at the present seat of government of the State, and for the purchase of additional state capitol premises, and also providing for the payment

of said bonds and interest accruing thereon,' approved March 16, 1911.''

The act of March 16, 1911 (Laws 1911, p. 416), referred to in sections 10 and 11 of the act above summarized, was the act which provided for the contracting of the liability and the issuance of bonds of the State of Missouri in an aggregate of not more than $3,500,000, the proceeds whereof ''shall constitute a fund to be designated as a capitol building fund, and shall be applied exclusively to the building of a new state capitol at the present seat of government of the State, including the furnishing and other equipment of said building and the purchase by the State of additional capitol premises adjoining those now owned by the State; *provided,* that three hundred thousand dollars of said fund, or so much thereof as may be necessary, shall be applied to the furnishing and other equipment of said capitol, and two hundred thousand dollars of said fund, or so much thereof as may be necessary, shall be applied to the purchase of land (adjoining the present state capitol premises) for additional state capitol premises. . . . Contract or contracts for expenditure to carry out the purposes of this act in excess of said three and one-half millions of dollars, with interest collected thereon, shall, to the amount of such excess, be illegal and void and forever non-payable.''

Section 2 of this act provides for the levy of an annual tax, and section 3 provides for the taking effect of the act after its ratification by a constitutional majority of the voters of the State.

By an act approved March 24, 1911 (Laws 1911, p. 250), the act next above summarized was submitted to the voters of the State, the manner of holding the election being prescribed in detail. The election resulted in the ratification of the act.

The provision of the act constituting the State Capitol Commission Board and other acts relating to

the new capitol are set out sufficiently to exhibit the foundations of the argument of counsel in the case. Of these acts no part which bears any relation to the question presented is omitted.

Upon the face of the statute it is beyond question that the State Capitol Commission Board has no authority to purchase furniture for the new capitol.

The act providing for the creation of the board and defining its powers makes no provision of any kind for the purchase of furniture. In its opening sentence it declares generally that the board is created "for the purpose of building a new state capitol." It specifies the contracts the board can make and none of these pertains to anything resembling the purchase of furniture. Pains are taken to provide for the severe punishment of any member of the board who is or shall become directly interested in certain specified contracts, all of which relate solely to the construction of the new capitol building. The oath prescribed deals solely with interest in like contracts. No such provisions relating to contracts for furniture are found in the act. The board is forbidden to adopt a plan of construction until it "shall be definitely ascertained that the . . . cost" thereunder shall not in the aggregate exceed three million dollars and certain interest thereon; thus fixing definitely the sum the board may expend for the building, including heating and ventilating apparatus, lighting, vaults and all proper fixtures and conveniences, as well as the "most modern and approved sanitary arrangements and equipment." It further provides that no contract or contracts shall be made or entered into by the board incurring in the aggregate an expense greater than three million dollars. These provisions fix the amount which the board may expend in the construction of the new capitol at three million dollars and the interest mentioned, and then forbid the board to enter into contracts of any

kind for a greater aggregate amount than that fixed as the maximum cost of the building.

In addition, under the act, the term of office of the members of the board can continue only "until the completion" of the new capitol building, and this is confirmed by a later provision that "the term of the members of the board *shall end with the construction of the building proper."* The board is charged to file and preserve its vouchers, contracts, etc., "until after the completion" of the *building,* when these are to be delivered to the Auditor. The records to be kept by the secretary pertain solely to the construction of the building.

The act is entirely clear and free from ambiguity and simply provides a board to which is committed specified duties, all relating solely to the construction of a capitol building and having nothing whatever to do with the purchase of furniture. It clearly and positively limits the board's power to expend the State's money to a sum of $500,000 less than the bond issue authorized by the people; and cognate acts above referred to disclose that this $500,000 is the sum set aside by the act submitted to the people as the maximum amount, out of the proceeds of the bonds, which is to be available for other purposes than the construction of the building, including furniture. This entire sum, out of which the provision for furniture is made, the board is directly excluded from using.

It is argued that the title of the act creating the board includes within it the title of the Act of March 16, 1911, and that this quoted title covers the furnishing as well as the construction of the new capitol. It may be conceded that in case the terms of an act are ambiguous, the title may be looked to for whatever light it can give. There is no ambiguity in the act of March 24, 1911, as already pointed out, and resort to the title is therefore not justified by the rule. Besides, the reference in the title to the title of the act of March

16, 1911, in no way can amplify the plain terms of the body of the act creating the board and confer upon the board powers the unambiguous language of the act denies them. The title of the act is broad enough to include all the law the Legislature actually wrote under it and is in harmony therewith. If it be assumed that it is broad enough so that more constitutionally might have been written into the act, this could not possibly justify us in writing into the act what the Legislature lawfully might have put in but actually left out. Further, the title reference to the title of the prior act explains itself and warrants no such construction as counsel seeks to put upon it.

It is argued that the people voted for a complete building, including furniture and not for an unfurnished building, "the use of which would be left to the uncertainty of future legislatures."

The Act of March 24, 1911, creating the State Capitol Commission Board, was passed long prior to the capitol bond election, and one result of that election was to give effect to that act. The particular act adopted at the election of 1911 made no provision for any board. That was necessarily left to the Legislature. Neither did the act adopted provide that a single board should have charge of the construction of the capitol and the purchase of furniture. The people did not, by their vote, prohibit the creation of separate boards, but left the Legislature untrammeled in that respect. The intent of the people was to do exactly what they did—leave the Legislature unrestricted with respect to the question whether the same board should both construct the capitol and purchase the furniture therefor.

Something is said concerning extrinsic facts supposed to bear upon the question of the advisability of permitting the board to purchase the furniture for the new building. No such facts are pleaded except the likelihood of delay in case the furniture cannot be pur-

chased before the meeting of the next Legislature. This is the argument from convenience. It has place in construing ambiguous statutes, but has none here. If the failure to provide that the board shall purchase the furniture for the new capitol is unwise, the responsibility lies with the Legislature. We have no power to reconstruct statutes merely to conform them to our idea of the wiser course in the premises. The peremptory writ is denied. All concur; *Bond, J.,* in separate opinion.

## CONCURRING OPINION.

BOND, J.—The act being unambiguous is self-interpretative, and constituted, in my judgment, no ground for this proceeding, of which, from the record, I am unable to take any other view than that it is a "moot" case of which this court should not have taken any cognizance and which should not have been presented to it.

I concur in the result of the learned majority opinion.